[No. A052930. First Dist., Div. Three. Nov. 20, 1991.]

BUILDING INDUSTRY ASSOCIATION OF NORTHERN CALIFORNIA et al., Plaintiffs and Appellants, v.
MARIN MUNICIPAL WATER DISTRICT, Defendant and Respondent.

**COUNSEL**

Collette & Erickson, John M. Collette, Robert A. Schwartz, Kenneth J. Cohen, Bianchi, Engel, Keegin & Talkington, Albert Bianchi and Craig A. Bestwick for Plaintiffs and Appellants.

Orrick, Herrington & Sutcliffe, George A. Yuhas and Mary J. Novak for Defendant and Respondent.

## Opinion

STRANKMAN, J.*—Appellants, Building Industry Association of Northern California (BIA), Perini Land and Development Company (Perini), and others, filed petitions for writs of mandate and for declaratory and injunctive relief, in which they sought to invalidate an ordinance adopted by respondent, the Marin Municipal Water District (the District), prohibiting new water connections in the District's service area. This appeal is from the judgment of dismissal entered after the trial court sustained the District's demurrer to appellants' third amended petitions without leave to amend. We affirm the judgment.

### Appellants' Allegations

According to the allegations of the petitions, the District is a municipal water district organized and existing under Water Code section 71000 et seq., which provides water to the southern two-thirds of Marin County.[1] Its water supply is highly variable and depends primarily on annual rainfall collected in a local reservoir system.

Appellants alleged that between 1982 and 1988, the District failed to take effective action to control demand or augment its available water supply, and that by 1988, demand approached the limits of that supply. In July 1988, the District declared a water shortage emergency pursuant to section 350 et seq.; in February 1989, it adopted a temporary moratorium on new water service connections. In December 1989, it enacted Ordinance No. 302, an indefinite moratorium on new water service connections, with certain limited exceptions, pending the development of new water supplies. As a result of the moratorium, no new water service is being allowed by the District for residential construction. Appellants allege that because the District has stated that it may take from five to ten years to authorize and construct facilities to augment its water supply, the moratorium will effectively block new housing construction for at least that period.

Appellant Perini wants to build 151 housing units on 81 acres which it owns in the District, in the Town of Corte Madera. Appellants alleged that

---

*Presiding Justice of the Court of Appeal, First District, Division One, sitting under assignment by the Chairperson of the Judicial Council.

[1]Unless otherwise indicated, all further statutory references are to the Water Code.

because of the moratorium, Perini will be denied a pipeline extension and will be unable to begin construction of that housing development.

The petitions alleged that the District (1) breached its statutory duties under the Water Code, including its duty to give priority to domestic use when adopting emergency water use restrictions; (2) breached its duty to augment its available water supply to meet increasing demands; (3) breached its duty to facilitate, not hinder, the development of housing; and (4) failed to comply with the terms of its own moratorium. Among other relief, the petitions sought a writ of mandate ordering the District to set aside its moratorium, allocate and reserve water for all domestic uses before imposing any new emergency regulations, and exert every reasonable effort to augment its water supply.

The trial court sustained the District's demurrer without leave to amend, on the ground that the allegations of the amended petitions did not establish any enforceable duty. Judgment was entered dismissing the action.

## DISCUSSION

### A.  *Introduction*

Our task here is to determine whether the facts alleged in the petitions for writ of mandate would entitle appellants to the relief they seek under any legal theory.  Although we must treat the demurrer as admitting all properly pleaded facts, it is not deemed to admit contentions, deductions, or conclusions of fact or law. (*Harris* v. *Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1149 [278 Cal.Rptr. 614, 805 P.2d 873; *Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].) Thus a demurrer does not admit the truth of argumentative allegations about the legal construction, operation, and effect of statutory provisions; similarly, it does not admit the truth of allegations that challenged actions are arbitrary and capricious or an abuse of discretion. (*Sklar* v. *Franchise Tax Board* (1986) 185 Cal.App.3d 616, 621 [230 Cal.Rptr. 42].)

Familiar rules governing the issuance of a writ of mandate are also applicable here. A petition for writ of mandate under Code of Civil Procedure section 1085 must plead facts showing that a public body or official has a clear legal and usually ministerial duty and that the petitioner has a beneficial interest in or right to the performance of that duty. (*Gilbert* v. *State of California* (1990) 218 Cal.App.3d 234, 241 [266 Cal.Rptr. 891]; *Elmore* v. *Imperial Irrigation Dist.* (1984) 159 Cal.App.3d 185, 193 [205 Cal.Rptr. 433].) On the other hand, a writ of mandate is not available to control the

discretion of that public body or official. Although a court may order a public body to exercise its discretion in the first instance when it has refused to act at all, the court will not compel the exercise of that discretion in a particular manner or to reach a particular result. (*McClure* v. *County of San Diego* (1987) 191 Cal.App.3d 807, 812 [236 Cal.Rptr. 653].) When the duty of a public body is broadly defined, the manner in which it carries out that responsibility ordinarily requires the exercise of discretion; under such circumstances, mandate is not available to order that public body to proceed in a particular manner. (See, e.g., *Sklar* v. *Franchise Tax Board, supra*, 185 Cal.App.3d at pp. 622-626 [mandamus will not lie to direct manner in which Franchise Tax Board should exercise its authority to administer state income tax laws].)

■ Finally, judicial review of regulations or restrictions adopted pursuant to section 350 et seq. is specifically limited to a determination of whether the water district's actions were "fraudulent, arbitrary, or capricious," or whether it failed to follow the procedure and give the notices required by law. (§ 358; *Swanson* v. *Marin Mun. Water Dist.* (1976) 56 Cal.App.3d 512, 517-518 [128 Cal.Rptr. 485].)

## B.   *The District's Duties Under the Water Code*

The District's resolution imposing the moratorium states the finding of its board of directors that the ordinance was a necessary and appropriate exercise of its authority pursuant to sections 350 et seq. and 71640. First, we consider appellants' contention that the District failed to comply with certain mandatory duties under section 350 and its companion sections.

■ Section 350 authorizes the governing body of a distributor of a public water supply to declare "a water shortage emergency condition" within its service area "whenever it finds and determines that the ordinary demands and requirements of water consumers cannot be satisfied without depleting the water supply . . . to the extent that there would be insufficient water for human consumption, sanitation, and fire protection." A water shortage emergency condition within the meaning of section 350 includes both an immediate emergency, in which a district is presently unable to meet its customers' needs, and a threatened water shortage, in which a district determines that its supply cannot meet an increased future demand. (*Swanson* v. *Marin Mun. Water Dist., supra*, 56 Cal.App.3d at pp. 519-521.)

Section 353 empowers a district to prescribe rules and regulations during a water shortage emergency. That section provides: "When the governing body has . . . declared the existence of an emergency condition of water

shortage . . . it shall thereupon adopt such regulations and restrictions on the delivery of water and the consumption within said area of water . . . as will *in the sound discretion of such governing body conserve the water supply for the greatest public benefit* with particular regard to domestic use, sanitation, and fire protection." (Italics added.) A ban on new service connections is explicitly authorized by section 356, which states: "The regulations and restrictions may include the right to deny applications for new or additional service connections . . . ."

Section 354 permits the setting of water use priorities during an emergency shortage. It provides: "After allocating . . . the amount of water which in the opinion of the governing body will be necessary to supply water needed for domestic use, sanitation, and fire protection, the regulations may establish priorities in the use of water for other purposes and provide for the allocation, distribution, and delivery of water for such other purposes, without discrimination between consumers using water for the same purpose or purposes."

■ Appellants read sections 353 and 354 to mean that before adopting a moratorium, the District was obligated to consider and make findings on the domestic water needs of both its current and its potential consumers; they then insist that the District had a statutory duty under section 354 to set aside water for all domestic users, both current and potential, before allocating water for other purposes, including nondomestic use by current consumers. To bolster their argument, they note that the Legislature has expressly declared domestic use to be "the highest use of water" in the state. (§ 106.)

Appellants' interpretation of the statutory scheme is not persuasive. Under the plain language of section 353, when a water shortage emergency occurs, a district has discretion to determine how to conserve its water supply for the greatest public benefit, and no findings are required. Section 353 certainly permits a district, in the exercise of that sound discretion, to respond by imposing rationing on its present consumers. The clear import of section 354 is that when a district does decide to impose rationing, it must first allocate or set aside the amount of water needed for domestic use, sanitation, and fire protection, and may then establish priorities for the use of water for other purposes.

Section 356 permits another response to a water shortage emergency; according to that section, a district's discretion includes the unrestricted right to deny applications for any new or additional service connections. Read together, sections 353 and 356 unquestionably allow districts to distinguish

between all existing or current consumers and potential users when deciding how to respond to a water shortage emergency; nothing in the legislation requires a district to grant some sort of priority or preference for potential domestic water users over current nondomestic users before imposing a ban on new service connections.

The allegations of the petitions reflect appellants' dissatisfaction with the District's determination of how best to respond to the water shortage emergency, but they do not establish any breach of statutory duty under these sections of the Water Code. Given this conclusion, we need not consider the District's alternative contention that it had separate and independent authority under section 71640 to impose a moratorium without giving priority to potential domestic users.[2]

### C. *The District's Duty to Augment Its Water Supply*

Appellants alleged that the District had a duty under *Swanson* v. *Marin Mun. Water Dist.*, *supra*, 56 Cal.App.3d at page 524, to "exert every reasonable effort to augment its available water supply" to meet increasing public demand. They alleged that the District breached this duty by arbitrarily refusing to pursue numerous available and feasible opportunities for augmenting supply.

The powers of a municipal water district such as the District are specified in section 71590 et seq. Section 71610 is permissive; it provides that a district "*may* acquire, control, distribute, store, spread, sink, treat, purify, reclaim, recapture, and salvage any water . . . for the beneficial use or uses of the district, its inhabitants, or the owners of rights to water in the district." (Italics added.) In addition, section 71590 provides in pertinent part that a district "may exercise the powers which are expressly granted by this division or are necessarily implied." ■ When exercising its statutory powers, a district's governing board of necessity has considerable discretion to decide what is in the best interest of the population it serves. (See *Wilson* v. *Hidden Valley Mun. Water Dist.* (1967) 256 Cal.App.2d 271, 286-287 [63 Cal.Rptr. 889].)

■ As the District points out, its determination of how the existing water system can and should be augmented can only be accomplished by an exercise of discretion. It must gather information and compare and evaluate various alternatives, taking into consideration numerous complex factors

---

[2]Section 71640 provides in pertinent part that a municipal water district "may restrict the use of district water during any emergency caused by drought, or other threatened or existing water shortage . . . ."

such as technical feasibility, time, cost, and revenue sources. The District has not refused to take action; appellants themselves have acknowledged in their petitions that the District has "commenced studies of water supply options." Appellants' allegation that the District has not exerted every "reasonable" effort to find more water is in reality no more than a disagreement with the District's approach to this difficult problem. That disagreement is insufficient to entitle them to mandamus relief.

*Swanson* v. *Marin Mun. Water Dist., supra,* 56 Cal.App.3d 512, which involves a previous moratorium imposed by the District, is of no assistance to appellants. As noted, the *Swanson* court held that a water shortage emergency under section 350 et seq. includes both an immediate existing water shortage and a threatened future shortage. It also rejected a constitutional argument that the moratorium resulted in a taking without just compensation, reasoning that a potential water user does not possess any absolute right either to water service or to the same treatment as established users of the water system. (56 Cal.App.3d at p. 522.) Recognizing the unfavorable consequences of its decision for the water service applicant, the court then added in passing, "Nevertheless, we do foresee a continuing obligation on the part of District to exert every reasonable effort to augment its available water supply in order to meet increasing demands. Clearly, the Legislature anticipated the need for such a requirement when it limited the duration of such restriction to the period of the emergency and 'until the supply of water available for distribution within such area has been replenished or augmented.' (§ 355.)" (*Swanson, supra,* at p. 524.)

The *Swanson* court did not attempt to outline precisely how a district might satisfy that "continuing obligation," and its admonition that a district must make every "reasonable" effort is itself recognition that the task can only be accomplished through the measured exercise of discretion. What appellants seek here is the exercise of that discretion in a particular manner to reach a result of their choosing, but mandate is unavailable for that purpose.

Appellants' reliance on *Carlton Santee Corp.* v. *Padre Dam Mun. Water Dist.* (1981) 120 Cal.App.3d 14 [174 Cal.Rptr. 413] is also unavailing. The question in *Carlton* was whether a water and sewer district could charge a connection fee before the connection was actually furnished. In that context, the court remarked that the district had a substantial responsibility to "fairly allocat[e] this vital finite resource for the benefit of the entire populace within the District when faced with a demand greater than the capacity of the system." (*Id.,* at p. 26.) Instead of furthering appellants' position, that

comment only reinforces the conclusion that a water district is necessarily entrusted with extensive discretion to accomplish its challenging task.

### D.   *The Duty to Facilitate the State's Housing Policies*

Next, appellants turn to the Government Code in their effort to find some ministerial duty which is enforceable by mandate. They contend that the District's adoption of the moratorium, without an allocation of water for potential domestic users, breached its duty under Government Code section 65580 et seq. to cooperate with the efforts of local governments to provide housing and address regional housing needs. However, the trial court correctly concluded that the District had no affirmative duty under the Government Code to provide water for new housing construction under the circumstances at issue here. It is true that state policy encouraging the development of residential housing is embodied in several sections of that code. For instance, counties and cities must include a housing element in their general plans. (Gov. Code, §§ 65300, 65302, subd. (c).) Government Code section 65580 declares that housing availability is of "vital statewide importance" and that the provision of affordable housing "requires the cooperation of all levels of government." (Gov. Code, § 65580, subds. (a), (c).) However, Government Code section 65580 is a general statement of public policy, not a directive to any agency, let alone a water and sewer district, on how to implement that policy.

The narrow question here is whether the Government Code sections relied on by appellants impose any ministerial duty on the District which is enforceable by mandate. Clearly they do not. Given that conclusion, we need not analyze the District's alternative argument that general state policy encouraging housing development must yield to what the District describes as the more specific and controlling policy, its goal of protecting and fairly allocating its finite resource when faced with a demand greater than the capacity of the system. (See *Getz* v. *Pebble Beach Community Services Dist.* (1990) 219 Cal.App.3d 229, 231-233 [268 Cal.Rptr. 76] [general statewide policy supporting the construction of senior housing units, as embodied in Gov. Code § 65852.1, must yield to competing specific policy mandating protection of coastal waters by limiting effluent discharge].)

### E.   *The District's Duty Under Its Ordinance*

Section 13.01.034 of the ordinance establishing the moratorium provides, "The District will continue to pursue sources of additional water supply. When supplies become available that are in addition to present supplies, such supplies shall be considered by the Board and be allocated in a manner

as deemed appropriate by the Board so long as the [Board] finds that there is no increase in magnitude or frequency of risk of future use reductions to existing consumers."

Appellants contend that this section of the ordinance obligated the District to allocate a new 200-acre-foot supply of water available from its reclamation project for the development of new housing. The argument is refuted by the language of the ordinance itself, which makes it clear that board is vested with discretion in determining how new water supplies are to be allocated. We reiterate that mandamus cannot be used to compel the District to exercise its discretion in the manner which appellants deem preferable.

### DISPOSITION

Appellants are not entitled to relief under the facts alleged, whether by way of mandamus, declaratory relief, or injunction. The judgment of dismissal is affirmed.

Merrill, Acting P. J., and Chin, J., concurred.

A petition for a rehearing was denied December 20, 1991, and appellants' petition for review by the Supreme Court was denied February 20, 1992. Arabian, J., was of the opinion that the petition should be granted.